## STEVENSON *v.* KURTZ.

FORGERY—EVIDENCE.

> The testimony of an aged man that he did not sign certain papers, which purport to have been executed by him 10 years previous as administrator, is insufficient to show a forgery, where it is so weakened on cross-examination that it amounts to little more than a statement that he has no recollection of signing them, and that, if he did sign them, it must have been when his hands were cold, and it further appears that he had little to do with the business of administrator, and that advanced age has rendered his memory very poor; especially if the papers are such as he would undoubtedly have signed upon request, thus doing away with any motive for a forgery.

Appeal from Wayne; Donovan, J. Submitted February 5, 1898. Decided March 1, 1898.

Bill by Girvin Stevenson and others against Frances Kurtz to set aside an administrator's sale of real estate. From a decree dismissing the bill, complainants appeal. Affirmed.

*Edward S. Grece* (*Howard J. Hall*, of counsel), for complainants.

*George Gartner*, for defendant.

LONG, J.    Defendant, by assignment, became the owner of a note and mortgage executed by one James H. Stevenson.    Proceedings were by her instituted to foreclose, in which a decree was entered.    Subsequently, and after the decree had been carried out by a sale of the mortgaged premises, the complainants in the present case, children and heirs of Stevenson, who had died, brought a bill of review to set aside the decree and the sale made thereunder.    The bill was on final hearing dismissed, and on appeal the dismissal was affirmed in this court. *Stevenson* v. *Kurtz*, 98 Mich. 493.

Pending the foreclosure proceedings, Stevenson died, and proceedings to administer his estate were had in the Wayne probate court.    Josephine Stevenson, the widow, was appointed administratrix.    Commissioners on claims were appointed, before whom the claim of Mrs. Kurtz on the note, to which the mortgage in process of foreclosure was collateral, was proved, allowed by, and reported to the probate court.    Upon a sale under the foreclosure decree, the sum realized failed to satisfy the amount due, a large deficiency remaining unsatisfied.    The administratrix having neglected and refused to subject the property of the estate to the payment of the debts proved, proceedings were instituted by Mrs. Kurtz in the probate court for her removal; and, after a hearing, she was removed from such trust, and one Joseph Karrer was duly appointed administrator *de bonis non* of said Stevenson's estate.    The only remaining property of the estate out of which to pay the debts proved against the estate was the

lot now brought in question in this suit.  Mr. Karrer, as administrator *de bonis non*, then petitioned the probate court for license to sell the same, which was granted; and the sale thereafter made was confirmed by the probate court, and a deed ordered executed to Mrs. Kurtz in pursuance of such sale.  This deed was executed September 22, 1885.  The complainants are the five children and heirs of said James H. Stevenson, the youngest of whom arrived at the age of majority in June, 1888.  The bill of complaint is brought to set aside the probate sale of the lot to Mrs. Kurtz, and was filed in June, 1893.  The answer of Mrs. Kurtz, the defendant, meets and answers fully the allegations of the bill, and sets forth the proceedings of the probate court, showing the proceedings in all things regular, and in full and strict compliance with all statutory requirements.  The hearing of the case on proofs taken in open court came on before the circuit court, in chancery, and a decree was entered in favor of defendant.  Complainants appeal.

It is contended by counsel for complainants that the sale to defendant was void, for the reason that the bond on the sale, the oath before the sale, and the final account of the administrator *de bonis non* were each and all of them forgeries.  Unless this claim is sustained, the complainants have no standing in court.  We have examined the testimony very carefully, and the circumstances under which these papers were executed, and agree with the court below that the complainants have not made out a case of forgery.  The original papers have been submitted to us.  It appears from the testimony of Mr. Karrer, the administrator *de bonis non*, whose signature is claimed to have been forged to the bond, oath, and account, that he had been for many years a member of the firm of Karrer Bros., which carried on a tannery business in the suburbs of the city, where he spent most of his time.  He was upwards of 70 years of age at the time of his examination.  He remembered signing a paper in the office of Mr.

116 MICH.— 7.

Gartner, who was then acting as attorney for the sale of this property, in 1885. This paper, which he admitted he signed, was the petition to the probate court for the sale of the property to pay debts. It is dated August 12, 1884. The bond is dated March 28, 1885, and as sureties appear the names of Aaron Karrar, the brother of the administrator, and William Champ, a clerk to Karrer Bros. at that time. Their signatures are admitted to be genuine. The oath before sale was taken before the same William Champ as notary public. Mr. Champ's signature thereto is admitted to be genuine. On the examination of Mr. Karrer, he was asked:

"*Q.* Do you know anything about having been appointed administrator of the estate of James H. Stevenson by the probate court?

"*A.* No; I do not. I had to sign one paper. * * *

"*Q.* Do you remember having anything to do with it?

"*A.* No; I do not recollect. That was five years ago; but I could not recollect. * * *

"*Q.* I show you a paper, Mr. Karrer, which is entitled 'Bond on Sale.' See if you recognize your signature on that paper.

"*A.* Well, that is a question. I find out such a thing; you cannot write your name twice alike when you have cold hands. I might put those signatures on, and not in the office. Sometimes Champ came up to the office or to the tannery, and I signed papers sometimes. I did not know exactly. * * * I say I cannot tell my signature. If I did it myself, I could not swear. * * *

"*Q.* Now, look at that signature which is on the petition.

"*A.* See that? That is different. If he came up to the tannery in a hurry, and signed in a hurry, write that. I see now the difference when I receipt a bill. It is different. Sometimes alike and sometimes not. I cannot give you any more satisfaction than that. * * * It might be; I could not say. How can I remember 15 years ago, when I am working hard? I do not pretend to; I told you that before. * * * I did not take time always when they wanted me to sign something. * * *

"*Q.* Look at this paper,—petition for license. Is that your signature? No question about that?

"*A.* No, sir. * * * Oh, I have seen it, and you

see that is different. I might have signed it. I would not swear. I think I signed it.

"*The Court:* Do you think that is your handwriting? " *A.* That is the way it looks. I cannot swear. Believe it is by the looks of it. Do not remember signing it. * * * It is so long ago. Do you suppose 15 years ago I can recollect everything? * * * I cannot swear either side. That is enough to state that is my name. * * * The first time I told you I could not swear. The others, I told you I could not say. I say I could not swear. I signed the papers in the tannery and at home. * * * I do not recollect so long. Am most 73. Speak German better than English. Write English slow and broken. My hands are hard and stiff. Deliver goods. * * *

" Q. You did not have anything to do with the Stevenson estate?

· "*A.* No, sir. I did not really know anything before he came up to the house. [This is when Mr. Grece first went to see witness.] * * * I answered I did not know if I did or not; that is all. You cannot make me swear to any other answer. I know I have just got as far as I know. There is no use talking that way. I told you the first time. I always told you I could not swear, and I tell you that now. * * *

"*Q.* I suppose you have failed? You have felt old age coming on you, and a great many things happened you do not now remember?

"*A.* Oh, yes! Thousands and thousands. My memory not very good; memory goes backward. * * * Have noticed my writing not always the same. Cannot do it alike. Have no recollection of signing a deed or signing any paper at all. Unless you show me a paper with my name, I would not remember anything at all about it."

It is true that on a former examination of this witness in this cause, before a notary public, he had testified that he did not sign these papers which are claimed as forgeries; but no cross-examination was then had. Complainants also called several experts in handwriting, who testified that the signatures to these papers were not in the handwriting of Mr. Karrer. It appears also that the name "Karrer" was misspelled, and in one instance the letter "h" was left off the name of Joseph. But we think

the whole explainable by the fact that Mr. Karrer had not much to do with the business of administrator. The papers were made out, and they were undoubtedly, as Mr. Karrer says, taken to the tannery for his signature. There, without much facility to write, and, as he says, while his hands were cold, he signed them.

There is nothing in the case showing, or tending to show, what motive any of the parties could have had in forging papers which Mr. Karrer would, without doubt, have signed if presented to him. He made the petition for the sale. The business was carried on by Mr. Gartner and Mr. Barlow, two of the most reputable attorneys of the Detroit bar. The papers, the bond and oath, were necessary papers in the proceedings. They were made at the time required, and filed in the probate office. Mr. Champ is dead. Mr. Karrer is an old man, and from his examination it can be seen that his memory is very poor. In fact, about all that can be said of the examination is that he had no recollection of signing those papers, and, his name being spelled differently, he thought it was not his signature. But his own explanation that, if he signed them, it was at the tannery, when his hands were cold, we think sufficient. It is not at all strange that, with his personal business, and what may have come before him as administrator, he could not remember the tenor and substance of every paper signed by him after the lapse of many years. It would be more strange if he could. There being no motive for the forgery shown, we cannot say that we are satisfied that the papers were forged.

The decree of the court below must be affirmed.

The other Justices concurred.